850 A.2d 585 (2004)
370 N.J. Super. 104
Linda R. FRENCH, Plaintiff-Respondent/Cross-Appellant,
v.
Enrique HERNANDEZ, John H. Decker, Decker Landscaping, Defendants-Respondents/Cross-Respondents,
v.
Harleysville Insurance Company, Third-Party Defendant/Appellant/Cross-Respondent, and
New Jersey Manufacturers Insurance Company, Intervenor-Respondent.
Superior Court of New Jersey, Appellate Division.
Argued March 17, 2004.
Decided June 21, 2004.
*587 Celine Vitale argued the cause for third-party defendant/appellant Harleysville Insurance Company (Stephen E. Gertler, Wall, attorney; Kenneth A. Seltzer, Old Bridge, on the brief).
John J. Hopkins, III, Long Branch, argued the cause for respondent/cross-appellant Linda R. French.
Edward Hoagland, Jr., Somerset, argued the cause for respondents/cross-respondents John Decker and Decker Landscaping.
Respondent/cross-respondent Enrique Hernandez did not file a brief.
Patricia M. Reilly argued the cause for intervenor-respondent New Jersey Manufacturers Insurance Company (Wolff, Helies, Duggan, Spaeth & Lucas, attorneys; John Peter Duggan, Red Bank, of counsel; Ms. Reilly, on the brief).
Before Judges LINTNER, LISA and S.L. REISNER.
*586 The opinion of the court was delivered by
LISA, J.A.D.
This appeal requires a determination of whether the driver of a vehicle, Enrique Hernandez, was a permissive user and thus covered by the insurance policy issued to the vehicle's owner, John H. Decker. Decker conducted a landscaping business and Hernandez was his employee. The vehicle operated by Hernandez was a pickup truck customarily used in the business. Hernandez' operation of the vehicle at the time of the accident was not during working hours and was without Decker's express authorization.
On cross-motions for summary judgment by the injured plaintiff, Linda R. French, her insurance company, New Jersey Manufacturers Insurance Company *588 (NJM), and Decker's insurance company, Harleysville Insurance Company (Harleysville), the trial judge found that Hernandez was a permissive user of Decker's vehicle. The judge reasoned that because Decker had allowed Hernandez to drive the vehicle on prior occasions in connection with his work, and because on the occasion of the accident Hernandez' use of the vehicle did not constitute theft or the like, Hernandez was a permissive user under the initial permission rule. The judge entered summary judgment orders on February 26, 2003 directing Harleysville to provide coverage, within its policy limits, to satisfy French's claim, and relieving NJM of any obligation to indemnify its insured, French, under its uninsured motorist coverage. Harleysville appeals from those orders. Although for reasons different than those expressed by the trial judge, Isko v. Planning Bd. of Township of Livingston, 51 N.J. 162, 175, 238 A.2d 457 (1968), we conclude that Hernandez was a permissive user and we affirm the February 26, 2003 orders.
In an earlier summary judgment proceeding, the judge granted Decker's motion for dismissal of French's claim against him, finding that at the time of the accident Hernandez was not acting in the scope of his employment and thus Decker was not liable under principles of respondeat superior. French cross-appeals from that order, entered on May 24, 2002. Relying on Carter v. Reynolds, 175 N.J. 402, 815 A.2d 460 (2003), she contends the law of respondeat superior in New Jersey has changed since the entry of the order and under the new standard all that is required for respondeat superior liability is employee conduct that was a foreseeable risk of the employer's business. We reject that contention and affirm the May 24, 2002 order.

I
Decker was a police officer who conducted a landscaping business as a second job. During the summer of 2000, Hernandez was Decker's only employee. Hernandez was nineteen-years old. We are uninformed of his employment commencement date, although it is clear this was seasonal employment. Hernandez filed no job application or tax forms. He was paid "off the books" in cash with none of the customary payroll withholdings.
Decker never asked and did not know whether Hernandez had a driver's license. Hernandez' primary language was Spanish, and he spoke little English. According to Decker, Hernandez was occasionally permitted to drive the pick-up truck on the job, but only on private property and only under Decker's personal supervision. Decker contends Hernandez was never allowed to drive the truck on public roads and was never allowed to use it for personal errands. At the end of work each day the truck and other landscaping equipment were locked up in a garage rented by Decker. The keys to the truck were kept in the garage. Decker denied that Hernandez had keys to the truck, but he could not recall whether Hernandez had keys to the garage.
On the evening of Sunday, August 13, 2000, Hernandez was operating Decker's truck on a public roadway. He drove in an erratic manner, crossing the center line and colliding head-on with French, causing her serious injuries. Hernandez was apparently intoxicated, as indicated by his post-accident demeanor and statements to the police and by the results of a blood test revealing a .166% BAC, well over the legal limit of .10%. N.J.S.A. 39:4-50(a).
We glean from the police reports that are part of the record that the truck was being operated with an ignition key and there was no indication of a break-in or *589 forced entry at the garage. Hernandez was also injured in the accident, but his injuries were not life-threatening. Patrolman Ramon A. Santos of the Dover Township Police Department interviewed Hernandez in Spanish at the local hospital to which he was taken from the accident scene. Santos' report describes what Hernandez told him:
Mr. Hernandez stated that he consumed approximately five to six beers prior to driving the motor vehicle. He stated that he did not remember where he consumed the beverages. He stated that the vehicle that he was driving, (NJ registration: K-L-B-2-7-X; 1985 Dodge Pickup) was parked near where he had been drinking and that he decided to take it for a ride. He did not remember where he gained access to the keys. He said that they could have been in the truck. He stated that he was too drunk to remember who he had been drinking with, however, he remembered that when he started the vehicle, someone told him not to drive because he was too drunk. He stated that the truck belonged to his employer, however, he did not have permission to use it.
Mr. Hernandez stated that he wanted to go visit a friend in Lakewood, NJ, (unknown address), and he did not remember what happened prior to the accident.
The police issued a number of motor vehicle summonses against Hernandez. Decker filed no charges against him for theft of the truck or unauthorized entry into the garage. Hernandez has not been seen or heard from since leaving the hospital. His whereabouts are unknown. It is believed he returned to his native Mexico. According to the police reports, he was an illegal alien and did not produce a driver's license. Decker has been deposed. In the trial court, all parties agreed that further investigation or discovery would not lead to development of any additional facts relevant to the coverage issue.[1]

II
The principal issue in this case is whether Hernandez was a permissive user. Harleysville argues he was not. In the trial court and on appeal the parties have framed the issue in terms of the initial permission rule. This construct was adopted by our Supreme Court in 1960:
Accordingly, we hold that if a person is given permission to use a motor vehicle in the first instance, any subsequent use short of theft or the like while it remains in his possession, though not within the contemplation of the parties, is a permissive use within the standard omnibus clause in an automobile insurance policy.

*590 [Matits v, Nationwide Mutual Ins. Co., 33 N.J. 488, 496-97, 166 A.2d 345 (1960) (emphasis added).]
The Court considered but rejected the moderate "minor deviation" rule that would require coverage as long as deviation from the actual permitted use is minor, and the strict "conversion" rule that any deviation from the time, place or purpose of the specified permission defeats coverage. Id. at 492-96, 166 A.2d 345. The Court noted that a broad interpretation of the omnibus clause would better effectuate the legislative policy of making collectible damages wrongfully inflicted on innocent members of the public in the operation of motor vehicles. Id. at 495-96, 166 A.2d 345. The Court concluded that the "minor deviation" and "conversion" rules, "making coverage turn on the scope of permission given in the first instance render coverage uncertain in many cases, foster litigation as to the existence or extent of any alleged deviations, and ultimately inhibit achievement of the legislative goal." Id. at 496, 166 A.2d 345. The "initial permission" rule, on the other hand, fulfills the legislative goal by "providing certain and maximum coverage." Ibid.
An essential element of the initial permission rule is that from the first time permission to use the vehicle is given until the time of the accident the user must be in continuous possession of the vehicle. That is not the case here. The trial judge disregarded that element. He found that because Decker allowed Hernandez to drive the vehicle on prior occasions, his subsequent use on the date of the accident, under circumstances not constituting a theft or the like, was a permissive use.
Harleysville correctly argues that this analysis was flawed and was a misapplication of the initial permission rule. We agree that because of the interruption in Hernandez' possession, the analysis must begin with whether Hernandez' use on the occasion of the accident was, in and of itself, a permissive one. As we will discuss, the prior occasions of authorized use are relevant and evidential, but do not establish a predicate for satisfaction of the initial permission rule. That analysis is better understood after some discussion about the initial permission rule and its underlying policy considerations.
The liberal initial permission rule has been derisively referred to as the "hell or high water" rule. Small v. Schuncke, 42 N.J. 407, 416, 201 A.2d 56 (1964) (Hall, J., concurring); Motor Club Fire & Casualty v. New Jersey Manufacturers Ins. Co., 73 N.J. 425, 439, 375 A.2d 639 (Clifford, J., dissenting), cert. denied, 434 U.S. 923, 98 S.Ct. 402, 54 L.Ed.2d 281 (1977); see also Jaquez v. National Continental Ins. Co., 178 N.J. 88, 96-98, 835 A.2d 309 (2003) (agreeing with Justice Clifford's analysis in Motor Club). In the forty-four years since the rule's adoption, the evolving case law has been generous in finding coverage. See, e.g., Verriest v. INA Underwriters Ins. Co., 142 N.J. 401, 662 A.2d 967 (1995) (prospective purchaser given keys for the purpose of performing repair work on the vehicle while it remained on the seller's lot); State Farm Mutual Ins. Co. v. Zurich Am. Ins. Co., 62 N.J. 155, 299 A.2d 704 (1973) (sixteen-and-one-half-year-old unlicensed person drove car in which his seventeen-year-old friend left the keys, where the friend took a short drive in a car owned by a third friend and the third friend then became a passenger of the sixteen-and-one-half year old); State Farm Mutual Automobile Ins. Co. v. Travelers Ins. Co., 57 N.J. 174, 270 A.2d 625 (1970) (employee of car dealership driving for personal purposes a customer's car that was brought in for service); Odolecki v. Hartford Accident & Indem. Co., 55 N.J. *591 542, 264 A.2d 38 (1970) (vehicle owner's teenage son, contrary to his mother's express instructions that no one else drive it, allowed a friend to drive it, who had an accident); Selected Risks Ins. Co. v. Zullo, 48 N.J. 362, 225 A.2d 570 (1966) (minor entrusted with car for limited and specific purpose deviated from such purpose when he and several friends drove for a soda); Small v. Schuncke, supra, 42 N.J. 407, 201 A.2d 56 (1964) (car owner gave keys to permittee while owner was in hospital so permittee could take owner's wife shopping and on errands, but permittee drove it for his own purposes, allowed a friend to drive it, and the friend had an accident).
In its recent discussion of the subject, the Court in Jaquez characterized the development of the jurisprudence this way: "Courts have held that a nearly unlimited range of conduct on the part of a driver or passenger, `short of outright theft [of the vehicle,] is within the scope of an insured's or owner's permission.' " Jaquez, supra, 178 N.J. at 93, 835 A.2d 309 (quoting Cynthia M. Craig and Daniel J. Pomeroy, New Jersey Auto Insurance Law § 6:3-5 at 135 (2003)). To be sure, however, the rule does contain an outer limit. Jaquez provides an example where coverage was not found.
It is helpful to iterate that the rule is two-pronged: (1) Did the insured or owner either expressly or impliedly give initial permission to the non-insured to use the vehicle? If so, initial permission is found and the analysis proceeds to inquire: (2) Did the subsequent use, while possession was retained, constitute theft or the like? If so, "we consider the insured's initial consent to have been vitiated, and there is no coverage." Id. at 95, 835 A.2d 309.
Jaquez turned on the first prong. There, Rochester drove her car to Mildred's apartment. Mildred's son, Ribot, wanted a cigarette. Rochester believed she had cigarettes in her car and gave Ribot the keys to get them. Ribot left the apartment saying, "Okay, I'll be right back." Id. at 90-92, 835 A.2d 309. However, Ribot got into the car, drove it, and had an accident. When Rochester realized her car was missing from its parking space, but before learning of the accident, she called the police and reported the car stolen. Ibid.
On those facts, the Court concluded that the concept of "use" was not broad enough to encompass retrieval of a pack of cigarettes from an automobile. Id. at 96, 835 A.2d 309. "Use" falls within the purview of the initial permission rule when it is "rationally connected to the vehicle for the purpose of providing transportation or satisfying some other related need of the user." Ibid. The Court was clear, however, that "the subtlety of [its] analysis," ibid., under the specific facts before it did "not signal a retreat from the traditional operation of the initial-permission rule." Id. at 100, 835 A.2d 309; see also id. at 96, 835 A.2d 309.
In Jaquez, the Court discussed another case resulting in no coverage, Nicholas v. Sugar Lo Co., 192 N.J.Super. 444, 471 A.2d 44 (App.Div.1983), certif. denied, 96 N.J. 284, 475 A.2d 582 (1984). In Nicholas, fourteen-year-old David Kligerman, while driving his parents' car on a public roadway, had an accident. One or two years earlier, when David was twelve or thirteen years old, his parents had allowed him to drive the vehicle on several occasions in their driveway and at a local airfield. This was always supervised by the parents and they specifically instructed David he was not permitted to drive on a public roadway. On the day of the accident, March 10, 1978, his mother was out-of-state and his father was at work. David used the key which he obtained *592 from his father's key chain. Id. at 447-48, 471 A.2d 44.
Under that "extraordinary factual background," id. at 447, 471 A.2d 44, we concluded that David did not have initial permission to operate the car. Id. at 452, 471 A.2d 44. We framed the controlling issue in the case: "Did David B. Kligerman have initial permission that in any way related to his use of the vehicle on March 10, 1978?" Ibid. (emphasis added). We noted that he violated his parents' expressly forbidden conduct and "his earlier limited permissive use at different places under his parents' supervision are so remote from the events of March 10, 1978, that the use on that day may not reasonably be regarded as being related to the earlier permission." Ibid. (emphasis added).
In Jaquez, the Supreme Court summarized the Nicholas holding: "Thus, it was not a question whether the son had exceeded the scope of some initial permission; the court [in Nicholas ] found that there was no permission to use the car at all on the date in question." Jaquez, supra, 178 N.J. at 95, 835 A.2d 309. Harleysville relies on Nicholas and argues it compels a finding of no coverage on its part. Harleysville argues that Hernandez' operation of Decker's truck was limited, supervised, off-the-road only, and at the time of the accident the truck had not been in Hernandez' continuous possession from the time of his earlier expressly permitted operation. Thus, according to Harleysville, as in Nicholas, this was not a deviation from the scope of some initial permission, but a situation where on the occasion of the accident there was no permission at all. We view this as a close case. But we find coverage.
First, significant factual distinctions materially separate this case from Nicholas. A close temporal proximity existed between the occasions of expressly permitted on-the-job use and the accident. The record does not reveal the exact dates, but we know that Decker employed Hernandez only during the summer season of 2000, and the accident occurred on August 13, 2000. At the time of the accident, the employer-employee relationship was ongoing.
Decker deposed that Hernandez never borrowed the truck or used it to run personal errands, and he conclusorily stated that Hernandez "knew he wasn't supposed to use the vehicle" and that on the night of the accident Hernandez "did not have permission to drive the truck." Still, Decker never stated that he ever communicated to Hernandez that he was not authorized to use the vehicle. This somewhat subtle distinction gains significance when viewed in light of Decker's uncertainty whether Hernandez had a key to the garage. The significance escalates another notch because of the absence of any sign of forced entry at the garage and Decker's failure to press any charges for a break-in at the garage or theft of the truck.
Another distinction is that Hernandez was of driving age and knew how to drive. He was not underage and receiving instruction as was David Kligerman. Although subsequent police investigation revealed that Hernandez could not produce a driver's license, and presumably did not have one, Decker was unaware of that circumstance. Likewise, although Decker later learned that Hernandez was an illegal alien, nothing in the record indicates that he knew it before the accident.
In addition to these significant factual distinctions, we note our qualifying comment in Nicholas:
We do not suggest from our result that subsequent permission to use a vehicle could not be inferred from the granting of initial permission at different *593 times. Thus it might well be reasonable to hold from a course of dealings between parties that the continuous granting of permission to use a vehicle implied permission to use it without express consent on another occasion. But this is not that case.
[Nicholas, supra, 192 N.J.Super. at 452-53, 471 A.2d 44.]
Thus, in appropriate circumstances, permitted use on prior occasions, coupled with other facts evidencing a course of dealings between the parties, can furnish the predicate to support implied permission on the subsequent occasion notwithstanding the absence of express permission on that occasion. Considerations of public policy are again important:
And permission involves no specific ritual. It may be given most casually, and may readily be implied from circumstances, especially when the actors are friends and the use involved is quite small. Ordinarily an insured would want his friend to be covered. That fact remains cogent, even if the insured is unable to say categorically that the operation was with his permission or consent. Weight must be given to the relationship of the parties and to the probabilities which that relationship would normally generate. When friends are involved, a court should lean toward a finding of coverage because such a finding, more likely than not, will accord with the unspoken truth.
Another factor strongly supporting an expansive view of the omnibus clause is the public concern for the victims of automobile traffic. It is in part for their protection that a policy of automobile liability insurance must contain an omnibus clause at least as favorable for coverage as the omnibus clause specified in N.J.S.A. 39:6-46(a). The public interest is advanced when doubts are resolved in favor of those victims.

[State Farm v. Zurich Amer. Ins. Co., supra, 62 N.J. at 179-80, 299 A.2d 704 (Weintraub, C.J., concurring in part) (emphasis added) (citations and footnote omitted).]
The prior use here was not so remote from the accident, in time or surrounding circumstances, to preclude the use at the time of the accident from being reasonably related to the earlier permission. Like the friends in State Farm v. Zurich, an employer would normally expect and want his employee to be covered when driving the employer's vehicle. Similarly, Harleysville would reasonably expect that the employees of a business whose vehicles it insures, and which the employees are sometimes allowed to drive, would be covered under the policy.[2]
The base fact pattern contemplated by the initial permission rule is a single trip in a vehicle by a permittee, who deviates from the scope of the permission for which the trip was authorized. Sometimes the facts are not so simple. Yet the permissive use issue must be analyzed to determine whether there is coverage. Permission can be express or implied. In this case there was no express permission on the date of the accident. The issue thus reduces to whether there was implied permission.
Generally, implied permission is
"an inferential permission, in which a presumption is raised from a course of conduct or relationship between the *594 parties in which there is mutual acquiescence or lack of objection signifying consent."
....
[I]t is "actual permission circumstantially proven".... The essence of the concept is that from all the surrounding circumstances a fact-finder could reasonably conclude that the use by the putative permittee was not contrary to the intent or will of the alleged permitter.
[Rutgers Casualty Ins. Co. v. Collins, 158 N.J. 542, 549, 730 A.2d 833 (1999) (quoting Zurich, supra, 62 N.J. at 167-68, 299 A.2d 704 (citations omitted)).]
Coverage has been found under the initial permission rule in circumstances where the accident occurred several days after initial permission was given to use the vehicle. See, e.g., Verriest, supra, 142 N.J. at 404-05, 662 A.2d 967; Small, supra, 42 N.J. at 410-11, 201 A.2d 56. But in these cases the owner or insured contemplated intermittent use by the permittee over several days, and the permittee's possession (although not use) was continuous from the time of initial permission to the time of the accident.
This case does not fall within the usual paradigm of the initial permission rule because of the break in continuous possession. Thus, contrary to the manner in which the parties have argued the case and the manner in which the motion judge decided it, the initial on-the-job permission, in and of itself, does not satisfy the rule's first prong. The earlier uses by Hernandez do not constitute initial permission on those occasions, followed by a deviation exceeding the scope of the permission while the truck remained in Hernandez' continuous possession. To satisfy the first prong in the factual setting of this case, initial permission must be found to have been given, expressly or impliedly, on the night of the accident, August 13, 2000. In the totality of the factual circumstances, and considering the legal principles and their underlying public policy bases, we are satisfied implied permission was established.
Decker sometimes allowed Hernandez to drive the vehicle. He was aware that Hernandez was of driving age and knew how to drive. Decker provided Hernandez, his ongoing employee, with the opportunity and means to drive the vehicle. It is reasonable to infer, because of the absence of forced entry into the garage, Decker's failure to press charges for a break-in, and Decker's equivocation over whether he gave Hernandez a key to the garage, that Hernandez had a key to the garage with Decker's knowledge. Hernandez was thus provided during non-working hours with access to the vehicle and its ignition key. Although Decker never gave express permission to Hernandez to drive the vehicle during non-working hours, he never expressly forbade it. This relationship and course of dealings is sufficient to establish implied permission on the night of the accident.
Having found the first prong met, a finding of coverage also requires a determination that Hernandez' use of the truck at the time of the accident did not constitute "theft or the like." In Jaquez, the Court lowered the bar previously set on this prong by the majority in Motor Club. In Motor Club, the Court held that theft "connotes nothing less than the willful taking of another's car with the intent permanently to deprive the owner of its possession and use." Motor Club, supra, 73 N.J. at 438, 375 A.2d 639. "[T]he `or the like' component of the exception ... contemplated conduct much more like traditional theft than the conduct here involved." Ibid.
*595 In Motor Club, a mentally disturbed passenger in the insured's automobile suddenly grabbed the steering wheel and ordered the driver out; "frightened by [the passenger's] actions and expression," the driver complied, exiting onto a traffic island in the street. Id. at 429, 375 A.2d 639. In Jaquez, the Court adopted Justice Clifford's dissenting opinion in Motor Club and declared that the Motor Club majority's holding on the second prong is no longer controlling authority. Jaquez, supra, 178 N.J. at 98, 835 A.2d 309. Intent to permanently deprive is no longer the test.
The reduced standard had not yet been announced when this case was decided in the trial court. The motion judge reasoned that Hernandez' conduct was far less egregious than that involved in Motor Club, and thus held there was no theft or the like. Under the modified standard, the result remains the same. The record establishes that Hernandez merely borrowed the truck with the intention to return it later. He did not hot-wire it or break into the garage to get it. As we have stated, it is reasonable to infer that Decker provided him with access to the vehicle and its ignition key. Hernandez had driven the vehicle from time to time in the recent past with Decker's knowledge. Decker did not press any theft charges. This was not a theft or the like within the meaning of the initial permission rule.

III
We next address two additional contentions raised by Harleysville. Harleysville argues summary judgment was not validly entered against it because French's amended complaint against it was never filed with the court. A copy of the amended complaint was attached to French's motion for leave to file an amended complaint. Harleysville was served with it, filed an answer, and fully litigated the issues it presented, never raising in the trial court any argument based on the non-filing. We decline to entertain an issue on appeal that was not raised in the trial court. Nieder v. Royal Indem. Ins. Co., 62 N.J. 229, 234, 300 A.2d 142 (1973); see cases cited at Pressler, Current N.J. Court Rules, comment on R. 2:6-2 (2004). Harleysville has been represented by counsel throughout these proceedings, it has suffered no prejudice, and, by participating to a conclusion in the litigation in the trial court without raising the issue, it has waived its right to assert it.
We also reject Harleysville's argument that summary judgment should have been denied to all parties and the matter should be remanded for trial. All parties, including Harleysville, took the position in the trial court that discovery was complete and no material facts were in dispute. All agreed that further investigation would not yield additional facts. On appeal, Harleysville does not identify any factual disputes. Decker has been deposed and Hernandez is gone. Harleysville never argued in the trial court that the matter was not ripe for summary judgment because of incomplete discovery or investigation. We are satisfied that disposition by summary judgment was appropriate. R. 4:46-2; Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540, 666 A.2d 146 (1995).

IV
We reject French's cross-appeal argument. She concedes that the motion judge "correctly dismissed the complaint against the business and its owner relying upon the old New Jersey standard that the activity complained of had to be in furtherance of the business enterprise." She incorrectly argues that our Supreme Court subsequently changed the law of respondeat superior in New Jersey with its decision *596 in Carter v. Reynolds, supra, 175 N.J. 402, 815 A.2d 460.
Contrary to French's argument, the Court in Carter and the companion case of O'Toole v. Carr, 175 N.J. 421, 815 A.2d 471 (2003), expressly declined to adopt the so-called enterprise liability theory, an expansive doctrine that predicates an employer's liability on the "risks incident to his enterprise." Carter, supra, 175 N.J. at 418-19, 815 A.2d 460. Instead the Court adhered to the traditional Restatement of Agency "scope of employment" test. Id. at 410, 815 A.2d 460. In O'Toole, the Court said: "As we stated today in Carter v. Reynolds, 175 N.J. 402, 815 A.2d 460 (2002[2003]), we have thus far declined to adopt [the enterprise liability theory], retaining instead the Restatement as our vicarious liability standard." O'Toole, supra, 175 N.J. at 425, 815 A.2d 471 (citing Restatement (Second) of Agency §§ 220, 228, 229 (1958)).
The law of respondeat superior remains unchanged, and the motion judge correctly applied it in finding no vicarious liability on Decker's part. Thus it is of no moment whether, as French argues, Hernandez' driving his employer's truck and causing an accident was a foreseeable risk of the employer's business, the loss of which should be absorbed by the business, which might render Decker vicariously liable under the enterprise liability theory. That Hernandez was not acting in the scope of his employment at the time of the accident is dispositive.
Affirmed.
NOTES
[1] On April 28, 2002, the case was arbitrated, R. 4:21A-1(a)(1), resulting in a finding of 100% liability assigned to Hernandez, and no liability assigned to French or Decker. French was awarded $300,000. The arbitration report stated that French incurred medical expenses of $127,599. The record is not clear regarding the amount of any judgment in favor of French against Hernandez. We are furnished with plaintiff's motion of June 7, 2002 to confirm the arbitration award in a total amount of $319,196.73, including pre-judgment interest. In her appellate brief, French represents that "[t]he defendants filed a De Novo" and that "Default Judgment was entered against defendant, Hernandez and after a hearing on proof, the final judgment was entered in the amount of $595,416.44." We are furnished with an unsigned order to that effect, stating the proof hearing was conducted on August 8, 2002 and reflecting an award of $550,000 plus pre-judgment interest to August 8, 2002 of $45,416.44. French represents the order was signed. The details and accuracy of this information are not germane to the issues before us. We provide the information only to give context to our discussion.
[2] It is not an uncommon scenario for employees to use company cars for arguably personal errands. Where the employer maintains insurance covering company vehicles and therefore covering employees as insureds, insurance companies should expect to provide coverage in these situations.